WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Carroll | No. CV-15-0560-TUC-LCK |
| Plaintiff, | **ORDER** |
| v. | |
| Nancy A. Berryhill, | |
| Defendant. | |

Plaintiff Richard Carroll filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). (Doc. 1.) Before the Court are Carroll's Opening Brief, Defendant's Responsive Brief, and Carroll's Reply. (Docs. 17, 18, 19.) The parties have consented to Magistrate Judge jurisdiction. (Doc. 13.) Based on the pleadings and the administrative record submitted to the Court, the Commissioner's decision is affirmed.

## PROCEDURAL HISTORY

Carroll filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on November 29, 2011. (Administrative Record (AR) 201, 205.) He alleged disability from November 18, 2010. (AR 40.) Carroll's application was denied upon initial review (AR 65-104) and on reconsideration (AR 105-50). A hearing was held on January 23, 2014 (AR 36-64), after which the ALJ found that Carroll was not disabled because he could perform other work available in the national

economy (AR 16-26). The Appeals Council denied Carroll's request to review the ALJ's decision. (AR 1.)

## FACTUAL HISTORY

Carroll was born on November 4, 1967, making him 43 years of age at the onset date of his alleged disability. (AR 201.) Carroll has past experience working in construction and as a bouncer at a bar. (AR 226, 244.) He stopped working in 2006, after an on-the-job injury.

The ALJ found Carroll had two severe impairments, degenerative disc disease and left shoulder pain. (AR 18.) The ALJ determined Carroll has the RFC to perform light work but can only reach overhead occasionally with his left arm. (AR 20.) The ALJ concluded at Step Five, based on the Medical-Vocational Guidelines, that Carroll could perform work that exists in significant numbers in the national economy. (AR 25.)

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.1520; 416.920; *see also Heckler v. Campbell*, 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings

of the Commissioner are meant to be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

## DISCUSSION

Carroll argues the ALJ committed four errors: (1) she ignored substantial evidence of Carroll's impairments and limitations; (2) she improperly weighed his activities of daily living; (3) she improperly imposed her own medical opinions; and (4) she failed to develop the record.

**Impairments**

At Step Two, the ALJ determined that Carroll had two severe impairments: degenerative disc disease and left shoulder pain. (AR 18.) A finding of disability requires an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment." 20 C.F.R. § 404.1505. A physical or mental impairment must last or be expected to last for 12 or more months and must be "established by medical evidence consisting of signs, symptoms, and laboratory findings,

1  not only by your statement of symptoms." 20 C.F.R. §§ 404.1508, 404.1509. An impairment is "not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 1521.

Carroll contends the ALJ failed to find other medically determined impairments at Step Two, specifically dizziness, headaches, positional syncope (loss of consciousness with bending), chronic fatigue, chronic sinus and throat infections, frequent urination, bowel incontinence, and chronic abdominal pain.[1] In the Reply brief, Carroll clarifies that the medically determinable impairments he is asserting are throat and sinus infections (which could result in headaches, throat pain, and syncope), irritable bowel syndrome (resulting in stomach pain and gastric problems), and musculoskeletal impairments (for which he takes Tramadol, which can cause lightheadedness, dizziness, fainting, and frequent urination). Carroll also argues the ALJ failed to account for the limitations of his right arm.

With respect to sinus and throat infections, Carroll reported recurrent infections causing sore throats, mouth breathing, snoring, and awakening at night. (AR 799.) In September 2011, he told his doctor he had experienced the symptoms for five years (AR 799-800), but there are no records indicating that Carroll previously sought treatment for these symptoms. Carroll did not report to the otolaryngologist that he was experiencing headaches or syncope. (AR 800-01.) After a tonsillectomy, Carroll continued to have neck and palate discomfort.[2] (AR 785.) However, the last record of treatment for a throat or sinus impairment is dated five months after the first appointment, in January 2012. Additionally, Carroll points to no evidence of record that his tonsillitis significantly

---

[1] Carroll cites no medical evidence of dizziness, positional syncope, chronic fatigue, or frequent urination; he refers only to his own statements. (Doc. 17.) Similarly, Carroll cites no medical evidence of record regarding headaches, with the exception of one record in which Carroll states they may have been caused by cervical spinal issues (AR 268). Based on the record, headaches were not a medically determinable impairment; however, Carroll's spinal issues were found to be severe at Step Two.

[2] At the hearing, Carroll testified to having a bone sticking into his throat, which he stated that Dr. Prust confirmed. (AR 58.) Dr. Prust identified a spot on Carroll's hard palate, not a bone in his throat. (AR 817.)

limited his ability to do basic work activities. For these reasons, it was not error for the ALJ to not include tonsillitis as a severe impairment as defined in the regulations.

With respect to irritable bowel syndrome, Carroll reported right lower quadrant abdominal pain in late September 2011, but no cause was identified. (AR 767-68, 771-71, 775, 776.) From May to July 2012, Carroll sought treatment again for the same pain, which was determined likely to be irritable bowel syndrome. (AR 886-87, 916-19, 922.) In August 2012, Carroll reported that the abdominal pain was much improved, he was not experiencing nausea, vomiting or diarrhea, and he declined further evaluation. (AR 931.) There are no further medical records addressing Carroll's irritable bowel syndrome or abdominal pain. There are no medical records indicating that Carroll experienced IBS symptoms significantly limiting his ability to work for a period of 12 or more months. Therefore, the ALJ did not err in not finding this to be a severe impairment at Step Two.

Carroll argues the ALJ ignored substantial medical evidence of right arm pain and numbness, including radiological evidence of possible fracture, a tear, and abnormal nerve signals of his right elbow. In 2006, Carroll had complaints of right elbow pain (AR 303, 317, 613, 614, 623, 640), which he indicated had improved by July of that year (AR 608). In July 2008, an MRI of Carroll's right elbow revealed a possible small inter-substance tear of the right triceps tendon. (AR 866.) In October 2008, Dr. Roger Grimes concluded Carroll had no impairment of the right elbow and it did not require further treatment. (AR 722.) Because Carroll cites no medical evidence of right elbow impairment at, or after, his alleged onset date of disability, the ALJ did not err in failing to find this to be a severe impairment.

Finally, the ALJ determined Carroll's musculoskeletal impairments to be a severe impairment at Step Two. Therefore, there is no basis for Carroll's argument that the ALJ should have made the finding, because she did. Additionally, to the extent Carroll argues that the ALJ failed to account for side effects from Tramadol (taken for his musculoskeletal impairments), he cites no record evidence of lightheadedness, dizziness, fainting, or frequent urination. *See supra* note 1.

Carroll has not established that the ALJ erred at Step Two.

**Daily Activities**

Carroll argues the ALJ found his conditions to be not as severe as he alleged in light of his daily activities. The ALJ cited Carroll's activities of daily living only for her finding that Carroll made inconsistent statements. Specifically, she contrasted Carroll's report in August 2012 that his daily activities were not significantly limited with his report at the January 2014 hearing that his activities were very restricted. (AR 23.) The ALJ concluded the medical evidence did not substantiate the reported decline. (*Id.*)

In general, "questions of credibility and resolution of conflicts in the testimony are functions solely" for the ALJ. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). Carroll argues that his daily activities could support an adverse credibility finding only if he spent a good portion of the day performing actions transferable to a work setting. That is one basis for an adverse credibility finding. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). However, an adverse credibility finding also is warranted if a claimant's activities contradict his testimony. *See id.* An ALJ may always rely upon "ordinary techniques of credibility evaluation" such as inconsistent statements. *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

The ALJ did not err in finding that Carroll's statements regarding his activities of daily living in August 2012 were not consistent with his statements at the January 2014 hearing. (*Compare* AR 928 *with* AR 40-63.) The next inquiry is whether there is substantial evidence to support the ALJ's finding that the physical medical evidence did not support a significant decline during this period.

Review of the entire medical record indicates treatment was helpful although Carroll's symptoms fluctuated over time. Carroll had two hospital visits for neck and back pain in 2010 (AR 734-44, 901-02), and he was diagnosed with cervical disk herniation at C5-6 that December (AR 763-66, 863). From then until August 2012, Carroll sought no treatment specific to his neck although he was on medication for his

spinal problems. An August 2012 MRI, indicated disc protrusion at C5-6 and C6-7. (AR 1038.) In early October 2012, Carroll reported his back and neck were doing "pretty good" with medication. (AR 1026.) After reporting increased pain, Carroll had cervical surgery in February 2013. (AR 1037-43.) In March and April, Carroll reported doing well post-surgery. (AR 1044, 1053.) In September, he reported neck pain but there are no subsequent records indicating follow-up treatment. (AR 1051.) In January 2014, Carroll told Dr. Hess that his neck was stiff and sore but his migraines, blurred vision, and legs were better, and he had slightly better cervical motion. (AR 1104.) From August 2012 to January 2014, Carroll's cervical symptoms fluctuated with surgery occurring during the period. Ultimately, Carroll reported improvement in symptoms over that period. During the same time frame, Carroll continued medication management and returned to getting lumbar epidurals for pain. (AR 940-41, 1002-03, 1026-27, 1053.) In September 2013, he continued medication and did not report low back pain. (AR 1047, 1051.)

Although the evidence from August 2012 to January 2014, is mixed. There is substantial evidence to support the ALJ's conclusion that there was not a "significant decline" as of January 2014. *See Valentine v. Comm'r Social Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). Thus, the ALJ's finding was not error.

**Medical Opinion**

Carroll argues the ALJ erred in finding that the epidural injections he received were helpful enough to allow him to resume work activity, and that the ALJ "imposed her own medical opinion." In particular, Carroll argues that after the injections he had cervical spine surgery due to severe symptoms and the symptoms continued post-surgery. The ALJ made two statements about Carroll's epidurals. First, she stated that, as of April 2013, "[t]he claimant is still getting epidurals that he reports as very helpful." (AR 22.)

1   This accurately represents the April 10, 2013 medical record, which states that Carroll
2   reported to Dr. Prust that he was continuing with epidurals because they were helpful to
3   him. (AR 1053.) Additionally, prior medical records reflect Carroll's reports that
4   epidurals were "very helpful." (AR 388 (5/1/08 "very effective"); AR 982 (9/28/09 "best
5   one ever"); ARS 978 (4/19/10 "markedly better").)

6   Second, the ALJ stated that Carroll had done physical therapy, injections and
7   radiological exams "with consistent reports of some success with pain management with
8   medications and injections, but increased pain and range of motion restrictions of his
9   neck and spine." (AR 22.) Carroll received a first lumbar epidural in October 2007 (AR
10  394, 397), which provided only a few days of relief (AR 392, 966.) In November 2007,
11  Carroll had a cervical epidural (AR 392), and reported at his next appointment that his
12  neck was doing well (AR 390). Due to low back pain, he had a caudal epidural in
13  February 2008. (AR 390, 964.) In May 2008, Carroll reported the epidural was very
14  effective for up to two-and-a-half months, and Dr. Prust gave him another one. (AR 388,
15  962.) Three months later, Carroll received the same injection after reporting continued
16  back improvement with a couple months of "total pain relief" in the low back after an
17  injection; however, he reported neck pain that day. (AR 677, 960.) In October 2008,
18  Carroll reported a 40% improvement in pain; he received another epidural. (AR 958,
19  989.) Carroll reported he had improved overall since beginning epidurals; however, in
20  February 2009, his pain was a bit worse than at the prior visit. (AR 987.) He received
21  another epidural. (AR 956.) Throughout 2009 and 2010, Carroll continued to report that
22  epidurals were very effective on his low back pain for up to two-and-a-half months. (AR
23  944, 946, 948, 974, 976, 980, 982, 985.) In January 2011, Dr. Prust gave Carroll a
24  cervical epidural, as his neck pain had become a more significant problem than back pain.
25  (AR 972-73.) Dr. Prust discontinued injections as of March 2011, because Carroll
26  indicated the medications he was taking were most helpful. (AR 820-22.) Through
27  October 2012, Carroll repeatedly reported that his prescribed medications were very
28  helpful. (AR 814, 816, 818, 910, 1026.) In January 2013, Carroll reported that after a

period of 6 months without an epidural his back pain began to worsen again, and Dr. Prust administered a caudal epidural; three months later, he indicated an intent to continue because they were helpful. (AR 970, 1002, 1053.)

There is substantial evidence of record that injections and medication were helpful in treating, if not eliminating, Carroll's pain. Contrary to Carroll's suggestion, the ALJ did not ignore Carroll's cervical problems; rather, she acknowledged that Carroll had increased neck pain despite treatment (AR 22).[3] In January 2014, one year post-surgery on his neck, Carroll reported to Dr. Hess that he had ongoing stiffness and soreness in his neck; however, his migraines, blurred vision, and legs were better, and he had slightly better cervical motion. (AR 1104.) At that time, Dr. Hess cleared Carroll to work, limited only by not lifting, or pushing/pulling, over 20 pounds; and no reaching above his shoulders. (AR 1069.) Similarly, on September 30, 2010, shortly before Carroll's alleged onset date, Dr. Ellen opined that Carroll was limited to lifting and pushing/pulling no more than 20 pounds, and should only walk as tolerated. (AR 738.) On August 15, 2012 and March 25, 2013, state agency reviewing physicians concluded Carroll could frequently lift 10 pounds; could occasionally lift 20 pounds, climb ramps/stairs, balance, stoop, kneel, crouch, crawl; could sit or stand/walk for up to 6 hours of a work day; and should limit reaching overhead with his left arm. (AR 97-99; 123-26.) There are no medical opinions in the record more restrictive than those cited above.

There is substantial evidence of record to support the ALJ's findings regarding Carroll's treatment—that he had success managing his pain with medication and injections. This finding is consistent with the treating and reviewing physicians' opinions that Carroll could work. Although there is evidence to support Carroll's argument, "the key question is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual

---

[3] Carroll made a similar argument within his first claim, that the ALJ failed to acknowledge his cervical problems (*see* Doc. 17 at 14); because it was not closely tied to the Step Two legal argument underlying that claim, the Court addresses it solely as part of this claim.

finding that the claimant is not disabled." *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). The Court finds there is such evidence in the instant case.

**Record Development**

Carroll argues the ALJ should have further developed the record because (1) Dr. Ellen's opinion about his functional capacity is ambiguous; (2) Dr. Hess's opinion is ambiguous about his functional capacity for full-time work; and (3) evidence of record indicates a worsening of lumbar symptoms not considered by the medical opinions. An ALJ must obtain additional evidence only when she determines the record is ambiguous or is not adequate to allow her to evaluate the evidence. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Carroll argues that the opinions of Drs. Ellen and Hess are ambiguous because they did not specify all of his exertional and postural abilities over the course of an eight-hour day. The last opinion from Dr. Ellen on Carroll's functional abilities is dated September 30, 2010, and it stated: "Work status is 20 pounds lifting limit, no standing or walking longer than tolerated, no push or pull more than 20 pounds." (AR 738.) In January 2014, Dr. Hess opined, "No lifting over 20 lbs. No pushing and/or pulling over 20 lbs. of force[.] No reaching above shoulders[.]" (AR 1103.) These opinions are not ambiguous because the doctors did not specify the amount of time Carroll could lift 20 pounds within an 8-hour work day; rather, it appears those doctors imposed no time limit on lifting 20 pounds. Similarly, the opinions are not ambiguous because they did not cover all possible exertional and postural limitations. Either the doctors did not consider every category and, therefore, had no opinion, or the doctors found no limitation in any other category. Either way, these medical opinions did not trigger the ALJ's duty to develop the record.

Next, Carroll argues the medical consultant did not consider his worsening lumbar symptoms. Carroll cites records from December 2010 (AR 763-66), October 2012 (AR 1026-27), and early 2013 (AR 1022-25). One of the consultants on which the ALJ relied

was Dr. Jensine Wright, who offered her opinion in March 2013.[4] There's no reason to believe she did not have this evidence at the time she offered her opinion.[5] Because one consulting physician considered these records prior to offering her opinion, Carroll has not established a basis for the ALJ to further develop the record.

## CONCLUSION

The Court concludes the ALJ did not err as to any of the claims raised by Carroll. Therefore, Carroll is not entitled to relief and his appeal is denied.

Accordingly,

**IT IS ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment.

Dated this 29th day of March, 2017.

_____
Honorable Lynnette C. Kimmins
United States Magistrate Judge

---

[4] Carroll does not identify to which medical consultant he is referring. The record contains multiple consultant opinions, and the ALJ relied upon two of their physical residual capacity assessments. (AR 24.)

[5] The cited evidence from 2012 and 2013 came from Rincon Pain Management. (AR 1022-27.) The administrative record indicates the Commissioner received evidence from that office on March 4, 2013. (AR 109.) Dr. Wright issued her RFC opinion on March 25. (AR 126.)